UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| HOWARD INDUSTRIES, INC., | ) | |
| --- | --- | --- |
| Plaintiff, | ) | |
| v. | ) | No. 2:16-CV-168 |
| BADW GROUP, LLC, and BRANDON WALDROP, Individually, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's Motion for Summary Judgment [doc. 43], Plaintiff's Brief Supporting the Motion [doc. 44], Plaintiff's Statement of Material Facts [doc. 45], Defendant's Responses [docs. 47 & 49], and Plaintiff's Reply [doc. 51]. For the reasons herein, the Court will deny Plaintiff's motion.

### I. BACKGROUND

After acquiring approximately ten years of experience in the commercial lighting industry, Defendant Brandon Waldrop "decided to pursue a dream" of his and established his own lighting business, Defendant BADW Group, LLC, in 2014. [Waldrop Aff., doc. 47-2, ¶¶ 2–3]. Mr. Waldrop managed BADW from his home as an ecommerce business—that is, a business that operates electronically on the internet. [Waldrop Dep., doc. 52-1, at 20:13–14; Waldrop Resp., doc. 47-1, at 3; Waldrop Aff. ¶ 10].[1] He was BADW's sole

---

[1] Pincites to the record refer to the electronic page numbers.

member. [BADW Interrog. Resp., doc. 44-2, at 2]. To finance BADW's start-up, he borrowed $20,000 from two erstwhile business associates, whom he eventually paid back in full. [Waldrop Dep. at 20:15–25; 21:1–5; 21:23–24].

He began promoting BADW with Google AdWords, an online marketing service. [Waldrop Aff. ¶ 7; Waldrop Dep. at 73:5–10; 88:19–24]. According to BADW, Google bills its advertisers on a "cost-per-click basis," which means that it charges them for each time someone clicks an advertisement, whether that person does or does not purchase the product. [Waldrop Aff. ¶ 7]. Mr. Waldrop relied on merchant cash advances—a type of loan for which BADW's receivables served as collateral—to pay for this service, as an investment in BADW's long-term growth. [Waldrop Dep. at 24:8–13; 26:1–7; Waldrop Resp. at 3, 7, 8; Waldrop Aff. ¶ 10].

In 2014, BADW entered into a contractual relationship with Plaintiff Howard Industries, Inc. [Waldrop Aff. ¶ 4]. BADW did not maintain its own inventory of lighting products, so once it received a customer's order and payment, it arranged for Howard Industries to ship the product to the customer. [*Id.*; Waldrop Dep. at 18:11–25; 19:1–23; 95:9–25]. In 2014, BADW amassed $127,903 in gross sales, and it shared a portion of those proceeds with Howard Industries. [BADW Interrog. Resp. at 2; Waldrop Aff. ¶ 5]. In 2015 and 2016, BADW's gross sales were higher, totaling $1,837,089 and $1,635,090, respectively. [BADW Interrog. Resp. at 2]. BADW also shared this revenue with Howard Industries. [Waldrop Aff. ¶ 5].

Throughout BADW's existence, Mr. Waldrop paid some of his personal expenses by using funds from BADW's bank account, [Waldrop Dep. at 74:16–19; Waldrop Resp.

at 2, 5; Waldrop Aff. ¶ 10], and at times he compensated himself with BADW's funds for the labor he put into building the company, [Waldrop Dep. at 69:1–16]. For instance, he paid himself with a portion of BADW's $20,000 start-up loan, as compensation for the time he devoted to setting up BADW's website. [*Id.*; Waldrop Resp. at 3; Waldrop Aff. ¶ 10]. He also periodically spent BADW's funds on gasoline and meals, used them to pay his phone bills and make purchases at retail stores, and expended them on his mortgage, lawn-care service, and funerary expenses for his pet. [BADW Account Statement, doc. 55-1, at 22–23, 27; Waldrop Dep. at 51:17–25; 52:1–6; 54:2–5; 75:19–23; 80:16–21].

Although BADW's sales exceeded a million dollars in 2015 and in 2016, BADW began to experience serious financial distress behind the scenes, which caused it to endure net *losses* in those years and soured its relationship with Howard Industries. [Waldrop Resp. at 4; Waldrop Aff. ¶¶ 6–8, 10]. In 2015, BADW began receiving complaints of undelivered orders from its customers. [Waldrop Aff. ¶ 6]. Howard Industries proceeded to mail a letter to BADW, stating that "unforeseen issues and product shortage" were resulting in "delays in shipping [BADW's] purchase orders." [Delay Letter, doc. 47-3, at 1]. In addition to complaining to BADW, unhappy customers posted negative online reviews, which hurt BADW's reputation. [Waldrop Aff. ¶ 6]. Mr. Waldrop even received threats from some customers. [Waldrop Dep. at 81:12–14]. The unfilled orders became so numerous that Shopify—an ecommerce platform that BADW used to track sales—froze its online account. [Waldrop Aff. ¶ 6]. In an effort to refund BADW's customers for the unfilled orders, Mr. Waldrop withdrew sums of money from BADW's bank account and mailed cashier's checks to them. [Waldrop Dep. at 72:6–18; 81:11–14].

Around this same time, Mr. Waldrop also learned from his bank that Google had recently been billing BADW tens of thousands of dollars—and sometimes hundreds of thousands of dollars—per month for its AdWords service. [Waldrop ¶ 8]. On some days, the charges eclipsed $13,000. [Waldrop Dep. at 73:5–8]. Mr. Waldrop concluded that a possible competitor had tried to sabotage BADW by continually clicking on BADW's ads to cause the charges to skyrocket. [Waldrop Aff. ¶ 8]. As BADW's operating costs multiplied, sales revenue dropped, and customers clamored for refunds, Mr. Waldrop borrowed over a hundred thousand dollars in merchant cash advances. [Waldrop Dep. at 85:3:1–18; 85:24–25; 86:1–11]. Although he notified Howard Industries of BADW's problem with Google and requested the relaxation of their contract while he attempted to resolve this problem, Howard Industries declined his request. [Waldrop Aff. ¶ 8]. He ultimately determined that BADW could not recover financially, and he decided to shutter the company. [*Id.* ¶ 9].

Howard Industries has now brought suit in this Court against Mr. Waldrop and BADW, alleging claims for (1) an unpaid sworn account of $384,314.88 in lighting products, (2) breach of contract, and (3) misconduct on Mr. Waldrop's part that entitles it to pierce BADW's corporate veil, [Am. Compl, doc. 25, at 3–4]. Howard Industries now moves for summary judgment only on the third claim, piercing the corporate veil. [Pl.'s Mot. Summ. J. at 1, 3]. Howard Industries asserts that this claim is the only remaining matter that requires resolution in this case, [*id.* at 1], and it bases this assertion on an order in which Magistrate Judge Corker recognized that "it appears the only remaining issue in this case is whether piercing the corporate veil is appropriate," [Order, doc. 24, at 3]. But

in the Pretrial Order [doc. 57]—which, by the parties' own terms, amends and supplants the pleadings—Mr. Waldrop disputes Howard Industries' right to hold him personally liable. [*Id.* ¶ D.12]. The Pretrial Order governs the parties' positions at this stage in the litigation—not the original Complaint [doc. 1], which was the active pleading of record at the time Judge Corker issued his order. *See Permasteelisa CS Corp. v. Airolite Co.*, No. 2:06-cv-569, 2008 WL 2491747, at *3 (S.D. Ohio June 18, 2008) (observing that "[t]he purpose of a Final Pretrial Order is to conclusively fix the issues that remain to be litigated"). Besides, the Court has neither granted any dispositive motion nor received a notice of settlement concerning any of the claims. If this case does progress to trial, the parties will therefore litigate the range of issues relevant to all the claims, not merely the lone issue of whether the corporate veil is pregnable, which the Court will now address in relation to summary judgment.

## II.  LEGAL STANDARD

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim

or defense, *id.* at 325, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

### III. ANALYSIS

"As a general rule, members, owners, employees or other agents of a Tennessee limited liability company have no personal liability for the debts or obligations of the company." *Edmunds v. Delta Partners, LLC*, 403 S.W.3d 812, 828–29 (Tenn. Ct. App. 2012) (quotation omitted)); *see* Tenn. Code Ann. §§ 48-217-101(a)(1), 48-249-

6

114(a)(1)(B). This general rule in Tennessee originates from the "strong presumption" that a corporation is a separate legal entity, distinct from those individuals who comprise the corporation. *Dolle v. Fisher*, No. E2003-02356-COA-R3-CV, 2005 WL 2051288, at *5 (Tenn. Ct. App. Aug. 26, 2005) (quotation omitted). A party can overcome this strong presumption and hold the individuals behind the corporation liable for a debt—a process known as piercing the corporate veil—when that corporation lacks funds to pay the debt because of misconduct in the corporate hierarchy. *Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, 437 (Tenn. Ct. App. 2008). The doctrine of piercing the corporate veil applies not only to corporations but also to limited liability companies. *Edmunds*, 403 S.W.3d at 828.

Tennessee courts apply an eleven-factor test when determining whether to pierce the corporate veil:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 215 (Tenn. 2012) (quoting *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)). No single factor is dispositive in and of itself;

rather, "courts will rely upon a combination of factors in deciding the issue." *Edmunds*, 403 S.W.3d at 830 (quotation omitted); *see Dolle*, 2005 WL 2051288 at *5 ("[W]e must keep in mind that no single factor is conclusive and each case 'must be decided on its own unique set of facts.'" (quotation omitted)). A court's decision to permit a party to pierce the corporate veil should be relatively rare, arising only in "extreme circumstances to prevent the use of a corporate entity to defraud or perform illegal acts." *Pamperin*, 276 S.W.3d at 437 (citations omitted); *see Edmunds*, 403 S.W.3d at 829 ("The principle of piercing the fiction of the corporate veil is to be applied with great caution and not precipitately, since there is a presumption of corporate regularity." (quotation omitted)).

### A. Fraud and Factors 8, 10, and 11

In arguing against the presumption of corporate regularity, Howard Industries batches factors 8, 10, and 11 into one group, raising a specter of misconduct by claiming that Mr. Waldrop improperly transferred BADW's assets to himself—to the detriment of its creditors. [Pl.'s Br. at 13–15]. To support this theory of misconduct, Howard Industries relies on Tenn. Code Ann. subsection 66-3-305(a), which concerns fraudulent transfers:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction[.]

Under this statute, Howard Industries maintains that Mr. Waldrop acted fraudulently because he began purchasing $384,314.88 in lighting products while BADW was on the brink of insolvency. [Pl.'s Br. at 13]. In this vein, it notes that when it demanded payment in May 2016, BADW had an account balance of only $11,834.16. [*Id.* at 5, 13]. But in response, Mr. Waldrop creates a genuine issue of material fact as to the question of fraud under Tenn. Code Ann. subsection 66-3-305(a), citing evidence establishing that BADW had over $435,000 in its account when it began purchasing the lighting products and that its funds evaporated only after Google automatically withdrew the bulk of them in a few months. [Waldrop Resp. at 5; Waldrop. Aff. ¶ 10].

Although Howard Industries tries to advance its theory of misconduct by arguing that BADW's paucity of funds meant that BADW was "wildly overextended and undercapitalized," it ignores the elephant in the room—not mentioning the unmistakable role that *it* played in BADW's financial collapse. [Pl.'s Br. at 5]. BADW operated partly, if not largely, on cash flow—more specifically, sales revenue. Howard Industries' failure to deliver the lighting products to BADW's customers led to an ebb, if not a standstill, in its cash flow. Indeed, Mr. Waldrop's evidence establishes that Howard Industries' failure to provide BADW's customers with their orders had severe effects on BADW's sales revenue, [*see* Waldrop Aff. ¶ 6; Waldrop Dep. 96:1–4], and BADW's out-of-pocket reparations for Howard Industries' shortcomings undoubtedly contributed to BADW's paltry bottom line. By refusing to acknowledge this fact—much less account for it in any meaningful way—Howard Industries makes little headway toward summary judgment. *Cf. Int'l Union, United Auto., Aerospace & Agric. Implement v. Aguirre*, 410 F.3d 297, 303

9

(6th Cir. 2005) ("The mere fact that the company ceased operation without being able to pay all of its debts is, of course, not the sort of injustice contemplated [in the veil-piercing analysis]." (quotation omitted)).

And while Mr. Waldrop concedes, as he must, that he relied on BADW's funds to pay some of his living expenses, the record does not indicate that he looted BADW for his personal benefit. [Waldrop Resp. at 5; Waldrop. Aff. ¶ 10]. He insists that he did not pay for "trips, vacations or extravagances of any nature" with BADW's funds, [Waldrop Resp. at 5; Waldrop. Aff. ¶ 10]—an assertion that Howard Industries does not dispute. He maintains that he allocated to himself the amount "absolutely needed at that point in time to pay bills, food, shelter and so forth," [Waldrop Dep. at 50:15–17]—$36,000 per year, based on his approximation, [*id.* at 50:22–25; 51:1–4]. Although Mr. Waldrop's assertion that he paid only for absolute necessities is dubious in light of his purchases at various retail stores and other places,[2] he attests that his limited use of BADW's funds was nevertheless "permitted by law." [*Id.* at 74:19].

Generally, the members of a limited liability company are entitled to a fair or reasonable distribution of the company's assets, unless a distribution of assets would make the company unable to pay its debts. Tenn. Code Ann. §§ 48-236-101, 48-236-105(a)–(b); *see* Tenn. Code Ann. §§ 48-220-101, 48-249-304 (providing for the distribution of profits to the members of a limited liability company). An analysis for piercing the corporate veil

---

[2] Mr. Waldrop, however, testified that he "frequently" entertained vendors and clients at restaurants, in an attempt to draw business to BADW, and that he often used BADW's funds for this purpose—not to eat out casually. [Waldrop Dep. at 52:6].

10

therefore requires courts to assess whether a member's use of the company's assets is "to the detriment of . . . [the company's] creditors," *Pamperin*, 276 S.W.3d at 440, so that the member rendered the company unable to satisfy its debts, *Oceanics Schs., Inc. v. Barbour*, 112 S.W.3d 135, 141–42 (Tenn. Ct. App. 2003); *see Edmunds*, 403 S.W.3d at 833 (noting that piercing the corporate veil may be appropriate if a member "*improperly* distribute[s]" the company's assets to himself (emphasis added) (citation omitted)).

Despite Mr. Waldrop's use of BADW's funds and BADW's accrual of debt in merchant cash advances, the record illustrates that Howard Industries still received hundreds of thousands, if not millions, of dollars in revenue from BADW during their partnership. [Waldrop Aff. ¶ 5]. Indeed, for most of BADW's lifespan, BADW appears to have paid its debts to Howard Industries with a steady revenue stream. Howard Industries raised no quarrel with BADW until 2016,[3] when a confluence of events broke BADW's back: (1) Howard Industries' failure to ship products to BADW's clients and (2) Google's large-scale billing of BADW's account. When viewing all the facts and drawing all reasonable inferences in Mr. Waldrop's and BADW's favor, the Court concludes that the upcoming bench trial could establish that *these* events—and not efforts on Mr. Waldrop's part to mine BADW's assets—precipitated BADW's inability to pay any debts it might have owed to Howard Industries. Under Tenn. Code Ann. subsection 66-3-305(a), and the relevant factors of the eleven-factor test, genuine issues of material fact therefore exist in the record and warrant a trial.

---

[3] As late as January 2016, Howard Industries even informed BADW that "[w]e value your business." [Delay Letter at 1].

### B. Additional Factors

Under the remaining factors, Howard Industries argues that "the total overlap" between Mr. Waldrop's finances and BADW's finances "clearly establishes that Waldrop treated BADW as an instrumentality or conduit" for his own affairs, rather than as an independent entity. [Pl.'s Br. at 17]. But its contention that a "total overlap" existed between Mr. Waldrop's funds and BADW's funds is an exaggeration, for the reasons that the Court has already identified. And although Howard Industries also asks the Court to take issue with the fact that "Waldrop was the sole owner and employee of BADW," [*id.*], this fact alone does not defeat the presumption of corporate regularity, *Edmunds*, 403 S.W.3d at 831 ("[T]he fact that a shareholder exercises complete dominion and control over a corporation alone is insufficient to justify piercing the corporate veil[.]" (citations omitted)). Having reviewed more than half of the eleven factors at this point, and finding none that favor piercing BADW's corporate veil, the Court will end its analysis here.

### IV. CONCLUSION

As the movant for summary judgment, Howard Industries fails to establish that the record is without genuine issues of material fact relating to its claim. Howard Industries Motion for Summary Judgment [doc. 43] is therefore **DENIED**.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge