IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| HOWARD INDUSTRIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:16-CV-168 |
| | ) |
| BADW GROUP, LLC, and | ) |
| BRANDON WALDROP, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM OPINION

Plaintiff Howard Industries, Inc. seeks judgment against defendants BADW Group, LLC, and Brandon Waldrop in the amount of $384,314.88, for actual damages, as well as prejudgment and postjudgment interest. The Court conducted a bench trial on January 24, 2019. Having carefully reviewed and considered the evidence and testimony presented, the Court is now prepared to issue its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately.").

## I. PROCEDURAL BACKGROUND

In an amended complaint, Plaintiff alleges that defendant Brandon Waldrop ("Waldrop") was the sole member of defendant BADW Group, LLC ("BADW"). [Doc. 25, p. 1]. The amended complaint further alleges that BADW was a retailer which sold commercial lighting products and, from March 28 through May 6, 2016, made numerous

purchases of such items from Plaintiff on an open account. [*Id*., p. 2-3]. According to the amended complaint, BADW bought a total of $384,314.88 of commercial lighting products from Plaintiff on that open account, for which no payments were ever made. [*Id*.]. The amended complaint raises claims for sworn account and breach of contract as to BADW, and a claim for piercing the corporate veil as to Waldrop. [*Id*. at 3-4].

In late 2016, defendant BADW (through counsel) conceded liability for the full amount of damages alleged. [Doc. 18]. BADW's first attorney later withdrew. [Docs. 33, 36]. Replacement counsel appeared [docs. 37, 38] but also subsequently withdrew. [Docs. 58, 61].[1]

As noted, the Court conducted a half day bench trial on January 24, 2019. Plaintiff appeared through counsel, and defendant Waldrop appeared *pro se*. Defendant BADW did not appear. *See United States v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th Cir. 1969) ("[A] corporate president may not represent his corporation before a federal court [and] a corporation cannot appear otherwise than through an attorney.") (citations and quotation omitted). As such, the Court granted default judgment in Plaintiff's favor as to BADW in the amount of $384,314.88. [Doc. 73]. Only the claim for piercing of the corporate veil remained at issue.

---

[1] Each attorney served as counsel of record both for defendant BADW and defendant Waldrop.

At the conclusion of trial, the Court directed the parties to file proposed findings of fact and conclusions of law. Plaintiff complied. [Doc. 75]. Defendant Waldrop did not, and the time for doing so has expired. [Doc. 15, p. 5].[2]

## II. FINDINGS OF FACT

According to the testimony of Plaintiff's credit manager John Reid, Plaintiff sold lighting products to BADW on credit.[3] Payment was due within 30 days of invoice. Reid further testified that BADW presently owed $384,314.88 and had owed that amount since May 6, 2016, notwithstanding Plaintiff's multiple demands for payment. The Court credits Mr. Reid's testimony.

Waldrop formed BADW, a Tennessee limited liability company, in 2014. [Trial exhibits, doc. 74, ex. 1, p. 10]. He was BADW's sole member. [*Id.*, p. 47]. BADW sold lighting products—primarily online—to commercial and residential customers. [*Id.*, p. 15]. BADW did not have a storage facility, warehouse, or brick and mortar store. [*Id.*, p. 18]. Its office was in Waldrop's home. [*Id.*].

As of September 2017, Waldrop was married. His wife was not employed and had not worked since 2012. [*Id.*, p. 10]. She had no income. [*Id.*, p. 38]. Defendant Waldrop had neither a personal bank account nor a personal debit or credit card. [*Id.*, p. 37-38].

---

[2] Plaintiff's proposed findings, however, are unaccompanied by any citations to the record. Plaintiff relies on both the trial testimony, for which no transcript has been ordered, and the documents Plaintiff entered into evidence. Those documents, in their printed form, stand more than eight inches tall. Plaintiff's omission of record citations has significantly delayed the conclusion of this case.

[3] Where not followed by a citation to the record, the Court's factual findings are based on the trial testimony.

3

BADW was initially funded by $20,000.00 in loans. [*Id.*, p. 18]. Within three months, Waldrop transferred almost all of that money to himself. [*Id.*, p. 67]. Thereafter, BADW was regularly funded by "numerous" merchant cash advances which would take a security interest in future receivables. [*Id.*, p. 22-24, 71]. Waldrop testified that "I" was "hammered on the fees for the loans." [*Id.*, p. 71]. As an example, two such loans came with origination fees of $1,200.00 and 2,000.00, respectively. [*Id.*, p. 78].

The record is virtually devoid of corporate records for BADW. According to Waldrop, to the extent such records existed they were maintained within online subscription entities such as Yahoo! Small Business, Shopify, and QuickBooks. [*Id.*, p. 11-13]. Waldrop explained that "I" eventually could not afford the cost of those services "so all the records were gone." [*Id.*, p. 10].[4]

Waldrop and BADW essentially have no "corporate records whatsoever." [*Id.*, p. 11]. Neither Waldrop nor BADW ever used an accountant. [*Id.*, p. 12]. When asked whether he understood that a balance sheet shows assets, liabilities, and owner's equity, Waldrop responded in the negative. [*Id.*, p. 41]. He does not know what an LLC "distribution" is.

According to Waldrop, BADW lost $71,052 in 2015 and $213,623 in 2016. [*Id.*, p. 85]. Nonetheless, he regularly took cash out of BADW, allegedly for both business and personal expenses. He is "not sure" how much of the cash was used for business purposes, and again he has no records. [*Id.*, p. 32-33]. Waldrop claimed that "I left most of my

---

[4] Waldrop made no effort to retrieve those purported records even when faced with a potential judgment in this case in excess of $380,000.00

4

income that I was owed in the business to keep the business growing. I only took out what I absolutely needed at that point in time to pay bills, food, shelter and so forth." [*Id.*, p. 48]. He does not know how much money he withdrew from BADW for personal spending [i*d.*, p. 55] but testified that he had the right to take as much of BADW's money as he wanted.

BADW funds were used to purchase a desktop computer and laptop for Waldrop's use, yet those devices contained "no business-related data." [*Id.*, p. 34]. Similarly, BADW purchased a new cell phone which Waldrop used as both his business and personal phone. [*Id.*, p. 35-36].

BADW paid Waldrop's $1,110.00 monthly mortgage. [*Id.*, p. 52, 72, 102]. Waldrop called that a "normal expense." [*Id.*, p. 72]. He also applied BADW funds—by cash and by check—to pay for lawn care. [*Id.*, p. 72-73, 77]. That, too, he deemed "a normal expense." [*Id.*, p. 72-73]. Waldrop used $2,781.90 from BADW's account to pay for pet burial expenses. [*Id.*, p. 78]. Waldrop stated that the bill was paid by check because "I didn't have collective thought to go withdraw the money" from BADW's account. [*Id.*].

Regarding purchases made with BADW's debit card at businesses such as Wal-Mart, Home Depot, Lowe's, and various restaurants, Waldrop "can't remember" whether and to what extent any were for business purposes. [*Id.*, p. 49]. Waldrop also used BADW's checks and debit card at numerous other businesses including Best Buy, gas stations, The Vitamin Shoppe, Personal Touch Pet Grooming [Trial exhibits, doc. 74, ex. 2; doc. 55, p, 27, 80], Abercrombie and Fitch, Academy Sports, grocery stores, Farm Bureau Insurance, Parkway Discount Wine and Liquor, Kay Jewelers, Fireworks

5

Supermarket, Tractor Supply, Lighthouse Wine and Spirits, Petsense Store, Redbox DVD rental, PetSmart, Johnson City Power, Ross Stores, Evergreen of Johnson City (a gardening and landscaping center), Shamrock Beverage and Tobacco Shop, and Northside Wine and Spirits. [Trial exhibits, doc. 74, ex. 5, numbered ex. p. 9, 14-15, 20, 115, 135-36, 141-43].

In addition to the debit card purchases, Waldrop withdrew a cash total of $159,544.36 from BADW's bank account. [Trial exhibits, doc. 74, ex. 1, p. 70]. He claims that some of the cash was applied to taxes and customer refunds, but he has no supporting documentation. [*Id.*, p. 94]. In his own words, "To the best of my knowledge, I can't remember what, you know, it was taken out for." [*Id.*, p. 70].[5]

In May 2016, Waldrop moved BADW's remaining funds from one bank account into another to block automatic withdrawals from lenders and others. [*Id.*, p. 86]. From the limited funds remaining in the new account, Waldrop withdrew $48,730.00 in cash. [*Id.*, p. 87-89]. He has "no documentation" of how the money was spent. [*Id.*, p. 87-89, 94, 97-98].

### III. CONCLUSIONS OF LAW

The Court has already granted default judgment in Plaintiff's favor as to its claims against BADW. [Doc. 73]. The only remaining issue is whether the corporate veil should be pierced, and Waldrop held accountable for the entirety of the judgment against BADW. On that question, the Court concludes in the affirmative.

---

[5] At both deposition and trial, Waldrop was an evasive and scattered witness. His testimony is not credited.

"As a general rule, members, owners, employees or other agents of a Tennessee limited liability company have no personal liability for the debts or obligations of the company." *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 828–29 (Tenn. Ct. App. 2012) (quotation omitted); *see also* Tenn. Code Ann. §§ 48-217-101(a)(1), 48-249-114(a)(1). This general rule originates from the "strong presumption" that a corporation is a separate legal entity. *Dolle v. Fisher*, No. E2003-02356-COA-R3-CV, 2005 WL 2051288, at *5 (Tenn. Ct. App. Aug. 26, 2005) (quotation omitted).

A party can overcome this strong presumption and hold the individuals behind the corporation liable for a debt—a process known as piercing the corporate veil—when that corporation lacks funds to pay the debt because of misconduct in the corporate hierarchy. *Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, 437 (Tenn. Ct. App. 2008). The corporate identity may be disregarded and the owner may be treated as identical to the corporation "upon a showing that it is a sham or a dummy or where necessary to accomplish justice." *Kutty v. U.S. Dep't of Labor*, 764 F.3d 540, 551 (6th Cir. 2014) (quoting *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). "The '[c]onditions under which the corporate entity will be disregarded vary according to the circumstances present in the case, and the matter is particularly within the province of the [t]rial [c]ourt." *Kutty*, 764 F.3d at 551 (quoting *Muroll Gesellschaft M.B.H. v. Tenn. Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995)). The doctrine of piercing the corporate veil also applies to limited liability companies. *Edmunds*, 403 S.W.3d at 828.

For a court to find that piercing of the corporate veil is warranted under Tennessee law, it must first find that the entity "has been used to commit fraud or wrong, to perpetuate

7

the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights." *Kutty*, 764 F.3d at 552-53 (quoting *Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979)); *accord Real Stone Veneers of Tenn., LLC v. Real Stone of Am., LLC*, No. 1:19-cv-33, 2019 WL 3797332, at *10 (E.D. Tenn. Aug. 12, 2019) (courts must first find that the corporation was used to commit a fraud, wrong, or injustice); *Underwood v. Miller*, No. M2019-00269-COA-R3-CV, 2020 WL 730881, at *4 (Tenn. Ct. App. Feb. 13, 2020) (same).

If a finding of fraud, wrong, or injustice is found, Tennessee courts then apply an eleven-factor test to determine whether to pierce the corporate veil:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 215 (Tenn. 2012) (quoting *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)). No single factor is dispositive in and of itself; "rather, courts will rely upon a combination of factors in deciding the issue." *Edmunds*, 403 S.W.3d at 830 (quotation omitted); *see also Dolle*, 2005 WL 2051288 at *5 ("[W]e must keep in mind that no single factor is conclusive and each case must be decided on its

8

own unique set of facts.") (citation and quotation omitted). "However, in all events, the equities must 'substantially favor' the party requesting relief[.]" *Rogers*, 367 S.W.3d at 215 (citing and quoting *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 89 (Tenn. 2010)).

### A. Fraud, Wrong, or Injustice

In Tennessee,

> No distribution may be made by an LLC, if, after giving effect to the distribution:
>
> > (1) The LLC would not be able to pay its debts as they become due in the ordinary course of business; or
> >
> > (2) The LLC's total assets would be less than the sum of its total liabilities . . . .

Tenn. Code Ann. § 48-249-306(a). In this case, Waldrop regularly made distributions to himself by cash, check, and debit card to pay for all of his family's personal expenses. *See* Tenn. Code Ann. § 48-249-102(8) ("'Distribution' means a direct or indirect transfer of money or other property by an LLC . . . with or without consideration . . . to or for the benefit of any of its members or holders of financial rights, as applicable, in respect of membership interests or financial rights."). Waldrop had no other source of income, nor did his wife.

According to Waldrop himself, BADW operated at a loss in 2015 and 2016. BADW had no significant assets other than its accounts receivables, which Waldrop pledged to merchant cash advance companies, which in turn "hammered" BADW. *See Fleetwood Servs., LLC v. Complete Bus. Solutions Grp., Inc.*, 374 F. Supp. 3d 361, 366 (E.D. Pa. 2019) ("[T]he merchant cash advance industry . . . is the merchant-to-merchant equivalent

9

of consumer pay-day lending."); *Essex Partners Ltd. v. Merchant Cash & Capital*, No. CV 11-03366 CAS (MRW), 2011 WL 13123326, at *6 (C.D. Cal. Aug. 1, 2011) ("It is apparent that the only purpose of the [merchant cash advance] transactions was to loan money at a usurious rate of interest.").

The Court accordingly finds that most, if not all, of BADW's distributions to Waldrop during 2015 and 2016 were done at a time when BADW's total assets were less than its total liabilities. *See* Tenn. Code Ann. § 48-249-306(a)(2). Further, for at least part of 2016, distributions were made at a time when BADW was unable to pay its debts in the regular course of business. *See* Tenn. Code Ann. § 48-249-306(a)(1). Therefore, the LLC was used to violate a statutory duty and to commit unjust acts in contravention of third parties' rights. *Kutty*, 764 F.3d at 552-53. As such, the Court now turns to *Allen*'s eleven-factor test to determine whether the corporate veil should be pierced.

### B. Failure to Collect Capital

No capital was pledged to BADW. This factor is inapplicable to the instant case.

### C. Gross Undercapitalization

BADW was grossly undercapitalized. It started with only $20,000.00, almost all of which was soon distributed to Waldrop. By 2016, BADW's only meaningful assets (its accounts receivable) were pledged as security for unfavorable loans. The Court finds that this factor heavily weighs in favor of piercing the corporate veil. *See Kutty v. U.S. Dep't of Labor*, No. 3:05-CV-510, 2011 WL 3664476, at *15 (E.D. Tenn. Aug. 19, 2011) (corporate veil pierced in part because corporate entities were "undercapitalized and operated at a loss").

### D. Nonissuance of Stock Certificates

BADW was a single-member LLC. This factor is inapplicable to the instant case.

### E. Sole Ownership by One Individual

BADW was solely owned by Waldrop. This factor weighs in favor of piercing the corporate veil.

### F. Use of the Same Office or Business Location

BADW operated out of a room in Waldrop's house. This factor weighs in favor of piercing the corporate veil.

### G. Use of the Same Employees or Attorneys

BADW had no employees other than Waldrop. In this litigation, BADW and Waldrop used the same attorneys. This factor weighs in favor of piercing the corporate veil.

### H. Use of the LLC as a Conduit

BADW received loans and customer payments. In part, those funds then flowed through BADW to pay all of Waldrop's living expenses, including his mortgage, insurance, fast food, pet care, fireworks, jewelry, and liquor store purchases. This factor weighs in favor of piercing the corporate veil.

### I. Diversion of Assets to the Detriment of Creditors

Again, Waldrop regularly and liberally used BADW's assets to pay his personal expenses. Further, at the end of BADW's active existence, Waldrop withdrew $48,730.00 of BADW's limited remaining cash and is unable to account for where that money went. This factor weighs heavily in favor of piercing the corporate veil. *See Kutty*, 2011 WL

3664476, at *16 (corporate veil pierced in part due to "significant" lack of evidence about the corporate entities' financial affairs).

### J. Use of the LLC as a Subterfuge in Illegal Transactions

As discussed in section III(A) of this opinion, Waldrop used BADW to violate a state statute. This factor weighs in favor of piercing the corporate veil.

### K. Formation of the LLC to Transfer to It the Liabilities of Another

There is no proof that Waldrop formed BADW for the purpose of transferring his personal liabilities to the LLC. However, his existing liabilities (mortgage, insurance, utilities, etc.) were *de facto* transferred to BADW. This factor weighs in favor of piercing the corporate veil.

### L. Failure to Maintain Arm's Length Relationships Among Related Entities

As discussed throughout this opinion, Waldrop and BADW did not stand at arm's length. BADW's bank account was Waldrop's bank account. Its phone was his phone. Its lawyers were his lawyers. Its income was treated as his income. In addition to check and debit card purchases, Waldrop withdrew almost $160,000.00 in cash from BADW and cannot account for where the money went. This factor weighs heavily in favor of piercing the corporate veil. *See Kutty*, 2011 WL 3664476, at *16 (corporate veil pierced in part because the owner "freely treated and shared personal and corporate assets as his own").

### M. Conclusion

The Court finds that BADW was used by Waldrop to violate a statutory duty and to commit unjust acts in contravention of third parties' rights. The Court further finds that a high majority of the *Allen* factors weigh in favor of (or heavily in favor of) disregarding

12

the corporate form. The corporate veil will be pierced, and the $384,314.88 judgment against BADW in this case will also be imposed on Waldrop, jointly and severally.

## IV. PREJUDGMENT INTEREST

Plaintiff also seeks prejudgment interest. Section 47-14-123 of the Tennessee Code authorizes trial courts to award prejudgment interest "in accordance with the principles of equity." "Trial courts are afforded a great deal of discretion and are entitled to deference regarding the determination of whether to award prejudgment interest." *Int'l Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 573 (Tenn. Ct. App. 2000) (citing *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn. 1998); *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994); *Wilder v. Tenn. Farmers Mut. Ins. Co.*, 912 S.W.2d 722, 727 (Tenn. Ct. App. 1995)).

The Tennessee Supreme Court in *Myint* articulated the following standard regarding the award of prejudgment interest:

> Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. Tenn. Code Ann. § 47-14-123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing.

*Myint*, 970 S.W.2d at 927 (citations omitted). "The court must also consider two additional criteria before a court should award prejudgment interest, whether the amount of the obligation is certain and not disputed on reasonable grounds, and whether the existence of the obligation itself is disputed on reasonable grounds." *Defender Servs., Inc. v. Mathis*

13

*Cos., Inc.*, No. 1:06-CV-95, 2009 WL 1346032, at *3 (E.D. Tenn. May 12, 2009) (citations omitted).

For the reasons cited throughout this opinion, the Court finds that neither the existence nor the amount of the defendant's obligation is disputed on reasonable grounds. The Court further finds that an award of prejudgment interest in this case would be equitable. Plaintiff has been legally entitled to the amount owed since May 6, 2016. Prejudgment (and postjudgment) interest will therefore be awarded at the postjudgment interest rate in effect on May 6, 2016. *See* 28 U.S.C. § 1961(a); *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998).

## V. CONCLUSION

Based on the court's findings of fact and conclusions of law, judgment will be entered in favor of the plaintiff, Howard Industries, Inc., against defendants BADW Group, LLC, and Brandon Waldrop, jointly and severally, in the amount of $384,314.88.

An order consistent with these findings and conclusions will be entered.

**IT IS SO ORDERED.**

ENTER:

   s/ Leon Jordan   
United States District Judge